J-A06005-22

2022 PA Super 54

COMMONWEALTH OF PENNSYLVANIA  :   IN THE SUPERIOR COURT OF
                                 :              PENNSYLVANIA
                                 :
              v.                 :
                                 :
                                 :
                                 :
WILLIE JAMES HARDY               :
                                 :
          Appellant              :   No. 430 WDA 2021

Appeal from the Order Entered March 9, 2021
In the Court of Common Pleas of Erie County
Criminal Division at CP-25-CR-0001647-1993

BEFORE:   MURRAY, J., SULLIVAN, J., and COLINS, J.*

OPINION BY MURRAY, J.:                        **FILED:  March 30, 2022**

Willie James Hardy (Appellant) appeals from the order denying his petition for deoxyribonucleic acid (DNA) testing pursuant to Section 9543.1 of the Post Conviction Relief Act (PCRA), 42 Pa.C.S.A. §§ 9541–9546.  Upon review, we deny Appellant's petition for remand[1] and affirm the order denying Appellant's petition for post-conviction DNA testing.

In 1993, Appellant was convicted of the murder of his co-worker and former girlfriend (the Victim).  Appellant and the Victim worked at Erisco Industries (Erisco), a factory in Erie, Pennsylvania.  On June 21, 1993, Appellant strangled the Victim at Erisco after he and the Victim had completed a night shift.  He then placed the Victim's body in her car, which was parked

_____

* Retired Senior Judge assigned to the Superior Court.

[1] Appellant filed a Petition for Remand with this Court reiterating the argument and requested relief set forth in his brief.  **See** Petition for Remand, 12/20/21, at 1-4; Appellant's Brief at 28-45.

at a loading dock. Appellant drove the car approximately one block, and parked it by railroad tracks.

In a prior appeal, we recounted the following facts:

[S]everal Erisco workers testified about the night that the Victim was murdered. First, Dale Teribery testified that he had waited for the Victim to exit Erisco after their shift was over at 11:30 that evening. Teribery explained that the Victim had gone to get her car that had been parked in Loading Dock 3. [Appellant's] motorcycle was also parked in Loading Dock 3. Teribery sat in his car smoking a cigarette, waiting for the Victim to leave. He thought that he saw the Victim's car drive down the street but, after beginning to pursue the vehicle, he discovered that he was mistaken. When he realized his mistake, Teribery drove around [Erisco], keeping it in his sight as much as possible, hoping to see the Victim's car exit the loading dock. Teribery noticed that the lights were still on in the loading dock, and the automatic door to the loading dock was closed. [Erisco] was briefly out of Teribery's sight while he rounded a corner, but when he was able to see [Erisco] again he noticed that the lights were out and the loading dock door was closed; Teribery assumed that he had missed seeing the Victim leave [Erisco]. Later, Teribery recalculated the time that it took to circle [Erisco], and decided that he could not have missed seeing either the Victim leaving or someone closing the door to the loading dock.

Police timed Teribery as he re-enacted his drive around Erisco. From this re-enactment, police determined that Teribery left Erisco at approximately 11:45 p.m.

Erie Police Sergeant Stephen Franklin testified that he had been in the vicinity of the Erisco facility on the night of June 21-22 while on routine patrol. While driving past Erisco, Sergeant Franklin noticed an individual leaving the Erisco facility on a motorcycle that was towing a trailer. Sergeant Franklin estimated from his logbooks that he observed this incident at 11:50 p.m.

*Commonwealth v. Hardy*, No. 1577 Pittsburgh 1996 (Pa. Super. Feb. 10, 1998) (unpublished memorandum at 4-6).

Several people, including Appellant and the Victim, were working at Erisco the night of the murder. N.T., 4/19/96, at 76-77, 151; N.T., 4/22/96 at 83; N.T., 4/24/96, at 69, 145-46. Appellant was the crew leader, responsible for assigning duties and closing Erisco at the end of the shift. N.T., 4/19/96, at 89-90. The uncontradicted trial testimony demonstrated that with the exception of Appellant and the Victim, all employees who had clocked out around 11:30 P.M., exited Erisco, and all except Mr. Teribery drove away. N.T., 4/19/96, at 67-68, 82-84; N.T., 4/22/96, at 83-84, 93-96; N.T., 4/24/96, at 69, 145-46.

> With respect to the Victim's clothing:
>
> Both the shirt and the jeans that the Victim was wearing were extremely dirty. Teribery testified that the Victim's clothing had not been that dirty when she completed her shift. Kaye Irwin, another co-worker who worked the second shift on June 21 with the Victim, also testified that the Victim's clothes had not been that dirty when the shift was over. The floor of the Erisco plant is covered with a greasy dirt from the machines used therein. …

*Hardy*, *supra* at 6. **The Commonwealth's forensic expert testified the dirt on Erisco's floor contained an unusual mixture of elements, and the samples taken from the Victim's clothing matched the mixture**. N.T., 4/26/96, at 17-26, 78-80.

Several Erisco employees confirmed that normally, only the front of their clothing from their thighs to stomach, and forearms to hands, got dirty. N.T., 4/19/96, at 80-81, 103-04; N.T., 4/23/96, at 186-88, 191, 203, 219; N.T., 4/24/96, at 169-70. They also testified that some employees wore protective

gear, including bibs, aprons, booties and gloves, and Appellant was wearing gloves the night of the murder. N.T., 4/22/96, at 81-82, 89, 106, 108; N.T., 4/23/96, at 188, 224. Co-worker Kaye Irwin testified the Victim habitually washed before leaving work and had done so the night of her murder. N.T., 4/22/96, at 93, 99, 102.

In addition,

Mr. Lyall Bills, maintenance foreman at Erisco, testified that the accordion gate of Loading Dock 3 had not been locked on the night of June 21st. A bolt that screws into this gate was missing. An octagon headed, three-eighth inch, threaded bolt was found lying next to the Victim in the back seat of her car. Mr. Bills testified that this bolt appeared to be the one missing from the accordion gate. In addition, police detective David Bagnoni took the bolt from the Victim's car and attempted to thread it onto the accordion gate at Loading Dock 3; the bolt fit into the gate perfectly.

Mr. Bills also testified that a certain string, identified later as the cord that had been around the Victim's neck, was used to wrap boxes at Erisco and could be found in a room off Loading Dock 3. He stated that he had never seen that type of twine or string any place other than the Erisco plant. In fact, a forensic expert, Mr. John Robertson, testified that the twine around the Victim's neck was identical to the samples taken from Erisco.

The Commonwealth also presented the testimony of Ms. Angela Stone who, at the time of the murder, lived behind the Erisco plant. Ms. Stone testified that, on the night of the murder, immediately following the late news, she walked to a nearby store. Ms. Stone did not notice anything amiss on the way to the store but, on her way home, she noticed a Blazer parked by the railroad tracks behind Erisco. She returned home at approximately ten minutes before midnight. Ms. Stone also saw the same car in the same location the following day, surrounded by police officers. This was the Victim's car, and the Victim was discovered inside.

*Hardy*, *supra* at 6-8.

Appellant established at trial that the area where the Victim's car was found was trash-strewn, and frequented by prostitutes and their customers, as well as residents of the surrounding buildings who parked their cars in the area. N.T., 4/23/96, at 256-57, 259-60; N.T., 4/24/96, at 56-58. In addition, evidence from the Victim's car had been contaminated by the Victim's current boyfriend, Kenneth Logan, co-workers who found her body, and emergency personnel and police. N.T., 4/19/96, at 192-98; N.T., 4/23/96, at 108-11, 244-45, 248; N.T., 4/24/96, at 23, 31. Also, there was a delay of more than 45 minutes from when police arrived at the scene and when they secured the area, allowing for the possible contamination of the car by bystanders. N.T., 4/24/96, at 31, 36, 39-40.

When police questioned Appellant, he was unable to detail the procedure he used to close the factory the night of the murder. Trial Court Opinion, 3/9/21, at 3. Appellant's timecard showed he punched out at 11:31 P.M., but did not activate Erisco's alarm until 11:52 P.M. *Id.* at 4. Police conducted three separate walkthroughs of Appellant's closing procedure, and ascertained Appellant had failed to account for 15 minutes of his time. *Id.* Appellant also gave conflicting versions of events that night. N.T., 4/29/96, at 23-45. Appellant relayed to Detective Bagnoni that after the shift ended and the other workers had left, he and the Victim were "the only two in the building." *Id.* at 25-26. According to Appellant, he was aware the Victim had a new boyfriend. *Id.* at 29. However, in the days prior to and on the night of the

murder, Appellant begged the Victim to marry him, but she refused. *Id.* at 23-32.

On December 10, 1993, a jury convicted Appellant of aggravated assault and first-degree murder. The trial court sentenced Appellant to life in prison. Appellant filed a direct appeal challenging the admission of hearsay testimony regarding the Victim's suspicion that Appellant had vandalized her car in the weeks prior to her murder. Finding merit to this issue, this Court vacated Appellant's convictions, and remanded for a new trial. *Commonwealth v. Hardy*, 663 A.2d 248 (Pa. Super. Apr. 11, 1995) (unpublished memorandum), *appeal denied*, 668 A.2d 1124 (Pa. 1995).

Following Appellant's second trial, a jury convicted Appellant of first-degree murder (although the trial court dismissed the aggravated assault charge). The trial court sentenced Appellant to life in prison. Appellant filed an appeal raising issues relating to sufficiency, recusal, and evidentiary rulings. In particular, Appellant challenged the trial court's preclusion of evidence of other crimes committed in the area around Erisco. This Court found no merit to Appellant's claims, and affirmed the judgment of sentence. *Commonwealth v. Hardy*, 714 A.2d 1084 (Pa. Super. Feb. 10, 1998) (unpublished memorandum), *appeal denied*, 727 A.2d 128 (Pa. 1998).

In November 1999, Appellant filed a timely first PCRA petition, which the PCRA court dismissed without a hearing. Appellant appealed and this Court affirmed. *Commonwealth v. Hardy*, 777 A.2d 502 (Pa. Super. Mar.

8, 2001) (unpublished memorandum), ***appeal denied***, 782 A.2d 542 (Pa. 2001).

On July 15, 2020, Appellant, through counsel, filed the instant petition for post-conviction DNA testing. Appellant sought re-testing of items that had been tested previously, all of which excluded Appellant as a DNA contributor. Petition for Post-Conviction DNA Testing, 7/15/20, at 1, 11-13. He also sought first-time DNA testing of various items found in and around the Victim's car. ***See id.*** at 18-19.

The Commonwealth filed a response on September 14, 2020, arguing that the petition was untimely and Appellant failed to make a *prima facie* case that DNA testing would prove his innocence. Commonwealth Response, 9/14/20, at 17-20. On November 2, 2020, Appellant filed a reply. On March 9, 2021, the trial court denied the petition without a hearing.[2] This appeal followed. Both the trial court and Appellant have complied with Pa.R.A.P. 1925.

On appeal, Appellant presents the following issues:

1. [Appellant], who is serving a life without parole sentence, filed a DNA testing motion in 2020 after being unrepresented for decades. Did the trial court err when it held that [Appellant's] petition for DNA testing was untimely, even though the DNA testing statute does not have any specific timing requirements?

---

[2] The trial court was not required to issue Pa.R.Crim.P. 907 notice. ***See*** 42 Pa.C.S.A. § 9543.1(d)(2).

2. [Appellant] sought DNA testing of both evidence that had been subjected to limited forensic testing decades ago in 1993 and of evidence, including the piece of twine likely used to murder [the Victim], that has never been tested. Did the trial court err in concluding that, with respect to both previously-tested and never-before-tested evidence, [Appellant] did not meet the threshold requirement of 42 Pa.C.S.A. § 9543.1(a)(2) of showing that newer DNA testing technology exists that could prove substantially more accurate and substantially probative results even though [Appellant] presented expert evidence about testing advances?

3. The Supreme Court and this Court have acknowledged the fact-intensive nature of an analysis of the timeliness of a post-conviction DNA testing petition, and [Appellant] presented expert evidence about testing advances. Did the trial court err in denying [Appellant's] petition without holding an evidentiary hearing?

Appellant's Brief at 3-4.

When reviewing an order denying a request for post-conviction DNA testing, we employ the same standard of review as when we review the denial of PCRA relief; *i.e.*, we determine whether the ruling is supported by the record and free of legal error. ***Commonwealth v. Gacobano***, 65 A.3d 416, 419 (Pa. Super. 2013).

Requests for post-conviction DNA testing are governed by 42 Pa.C.S.A. § 9543.1, which provides in relevant part:

**(a) Motion.--**

(1) An individual convicted of a criminal offense in a court of this Commonwealth may apply by making a written motion to the sentencing court at any time for the performance of forensic DNA testing on specific evidence that is related to the investigation or prosecution that resulted in the judgment of conviction.

(2) The evidence may have been discovered either prior to or after the applicant's conviction. The evidence shall be available for testing as of the date of the motion. If the evidence was discovered prior to the applicant's conviction, the evidence shall not have been subject to the DNA testing requested because the technology for testing was not in existence at the time of the trial or the applicant's counsel did not seek testing at the time of the trial in a case where a verdict was rendered on or before January 1, 1995, or the evidence was subject to the testing, but newer technology could provide substantially more accurate and substantially probative results, or the applicant's counsel sought funds from the court to pay for the testing because his client was indigent and the court refused the request despite the client's indigency.

* * *

(6) The motion shall explain how, after review of the record of the applicant's trial, there is a reasonable possibility … that the testing would produce exculpatory evidence that would establish:

   (i) the applicant's actual innocence of the offense for which the applicant was convicted;

* * *

**(c) Requirements.**--In any motion under subsection (a), under penalty of perjury, the applicant shall:

* * *

(2)(i) in a sworn statement subject to the penalties under 18 Pa.C.S. §§ 4902 (relating to perjury) and 4903 (relating to false swearing), assert the applicant's actual innocence of the offense for which the applicant was convicted and that the applicant seeks DNA testing for the purpose of demonstrating the applicant's actual innocence; and

* * *

   (3) present a prima facie case demonstrating that the identity of or the participation in the crime by the

- 9 -

perpetrator was at issue in the proceedings that resulted in the applicant's conviction and sentencing; and

> (ii) DNA testing of the specific evidence, assuming exculpatory results, would establish … the applicant's actual innocence of the offense for which the applicant was convicted;

\* \* \*

**(d) Order.**—

(1) Except as provided in paragraph (2), the court shall order the testing requested in a motion under subsection (a) under reasonable conditions designed to preserve the integrity of the evidence and the testing process upon a determination, after review of the record of the applicant's trial …

\* \* \*

(2) The court shall not order the testing requested in a motion under subsection (a) if, after review of the record of the applicant's trial, the court determines that there is no reasonable possibility … that the testing would produce exculpatory evidence that:

> (i) would establish the applicant's actual innocence of the offense for which the applicant was convicted[.]

42 Pa.C.S.A. § 9543.1.

Appellant first disputes the trial court's conclusion that his petition was untimely. Appellant's Brief at 28-36. Appellant cites no case law to support his contention that his petition, filed approximately 20 years after his judgment of sentence became final, is timely. *Id.* Rather, Appellant challenges the trial court's reliance on ***Commonwealth v. Edmiston***, 65 A.3d 339 (Pa. 2013), ***overruled on different grounds by Commonwealth v.***

*Small*, 238 A.3d 1267 (Pa. 2020), and *Commonwealth v. Walsh*, 125 A.3d 1248 (Pa. Super. 2015). *Id.* at 31-36.

The Commonwealth counters that Appellant "could have — and should have — sought DNA testing earlier than twenty-four years after his conviction." Commonwealth Brief at 37-38. The Commonwealth points out that Appellant did not seek DNA testing after the denial of his PCRA petition in 2000. *Id.* at 38. The Commonwealth claims Appellant, "seeks to have a second bite at the apple with regards to testing the evidence." *Id.*

"Section 9543.1(d) requires the petitioner to make a timely request for DNA testing."[3] *Walsh*, 125 A.3d at 1254-55. "In analyzing timeliness for purposes of Section 9543.1(d)(1)(iii), the court must consider the facts of each case to determine whether the applicant's request for post-conviction DNA testing is to demonstrate his actual innocence or to delay the execution of sentence or administration of justice." *Id.* at 1255.

In finding Appellant's petition untimely, the trial court explained:

Though DNA testing was available and performed on some items of evidence prior to [Appellant's] trials, [Appellant] did not request DNA testing on the remaining items. Notably, [Appellant's] DNA was not found on items tested. Despite [Appellant's] averment of advances in many areas of technology including DNA testing, [Appellant] waited 27 years after his first conviction in 1993 and 24 years after his second conviction in 1996 to request any DNA testing.

---

[3] "The PCRA's one-year time bar does not apply to motions for the performance of forensic DNA testing under Section 9543.1." *Walsh*, 125 A.3d at 1252 (citations omitted).

* * *

> Since his first and second trial, [Appellant] has been aware of the evidence he now wishes to be tested. … No new evidence has come to light. [Appellant] relies on advances in DNA testing. However, ***Commonwealth v. Walsh*** states, "[T]he statute does not make advances in technology an excuse for failing to timely request DNA testing." ***Commonwealth v. Walsh***, [125 A.3d at 1256]. [Appellant's] attempts to distinguish the facts in this case from those in ***Edmiston*** are unavailing.

Trial Court Opinion, 3/9/21, at 15-16. We agree.

In ***Edmiston***, the defendant was sentenced in 1989 to death for the murder of a two-year-old girl. ***Edmiston***, 65 A.3d at 342-44. After unsuccessfully filing two PCRA petitions, the defendant in 2009 — more than 19 years after his conviction — filed a petition for post-conviction DNA testing. ***Id.*** at 344. In deeming the petition untimely, our Supreme Court highlighted that the defendant did not seek additional DNA testing at trial; or in 2002, when the post-conviction testing provisions were enacted; or in his second PCRA petition. ***Id.*** at 357-58. The Supreme Court concluded:

> Appellant's guilty status has not changed since his 1989 conviction; advances in technology allegedly occurring after that date do not explain why he, if truly innocent, did not seek immediate testing, or, at the very least, testing available as technology improved during the intervening years, rather than languishing on death row, all the while being supposedly innocent.

***Id.*** at 358.

Similarly, in ***Walsh***, the defendant was convicted of murder. His conviction was affirmed on appeal, and he subsequently filed three unsuccessful PCRA petitions. ***Walsh***, 125 A.3d at 1251. In 2014, more than

10 years after his conviction, he filed a petition for post-conviction DNA testing, which the trial court denied. *Id.* On appeal, we affirmed the trial court's determination that the petition was untimely. *Id.* at 1258. We observed that the evidence he sought to test was "discovered and available" before trial, when DNA testing was available, and further, he had not sought DNA testing in his PCRA petitions. *Id.* at 1257-58.

Instantly, we agree with the trial court that **Edmiston** is analogous. The items Appellant seeks to test were available at trial, and some of the items were tested and the test results excluded Appellant as a contributor. Appellant did not request the additional testing before or after either of his trials. Also, Appellant did not raise the issue of DNA testing in his PCRA petition. As noted, the post-conviction testing provisions were enacted in 2002. Appellant did not request testing after the enactment. While Appellant was unrepresented following the denial of his request for PCRA relief, he has proffered no explanation as to why he did not seek DNA testing, *pro se* or otherwise, between 2002 and 2020, when he filed the instant petition. In sum, Appellant has not explained why, "if truly innocent, [he] did not seek immediate testing, or, at the very least, testing available as technology improved during the intervening years, rather than languishing [in prison], all the while being supposedly innocent." **Edmiston**, 65 A.3d at 358. This issue does not merit relief.

In his second issue, Appellant maintains the trial court erred in finding he had not met the requirements of 42 Pa.C.S.A. § 9543.1(a)(2). Appellant avers there is "newer DNA testing technology … that could provide substantially more accurate and substantially probative results as to previously-tested evidence." Appellant's Brief at 37. Appellant contends that using newer DNA technology to test the "never-before-tested evidence … could yield the identity of the true perpetrator in this case." *Id.* at 43.

The Commonwealth asserts Appellant did not meet the requirements of 42 Pa.C.S.A. § 9543.1(a)(2) because he "knew of the existence of the evidence throughout the entirety of the 1993 trial, 1996 trial, and [his] 2000 PCRA petition, and chose not to subject the evidence to testing." Commonwealth Brief at 30 (emphasis omitted). The Commonwealth points out that, at both trials, the defense strategy was to challenge forensic testing demonstrating the Victim was killed inside the factory, as well as findings concerning the time of death; Appellant never asserted that the DNA testing was insufficient. *Id.* at 32-33.

The trial court agreed with the Commonwealth in concluding Appellant was not entitled to post-conviction DNA testing as to the previously tested items or untested items. Trial Court Opinion, 3/9/21, at 13-14. The court emphasized that the previously tested items excluded Appellant. *Id.* at 13. The court stated:

> This is not a case where prior DNA results were inconclusive or could not exclude [Appellant] as a possible contributor of DNA.

- 14 -

> Under these circumstances, even in the face of newer technology, [Appellant] has failed to satisfactorily demonstrate how DNA re-testing of these items could provide "substantially more accurate and substantially more probative results."

*Id.* at 13-14.

With respect to the untested items, the court opined Appellant had not met the threshold requirements. It noted that the items were all known before trial; DNA testing was available at the time of trial; the verdict was rendered after January 1, 1995; and the court did not refuse funds for DNA testing. *Id.* at 14.

Appellant also claims he established a *prima facie* case of actual innocence. Appellant's Brief at 36-44. To succeed on a petition for DNA testing "[t]he text of the statute set forth in Section 9543.1(c)(3) and reinforced in Section 9543.1(d)(2) requires the applicant to demonstrate that favorable results of the requested DNA testing would establish the applicant's actual innocence of the crime of conviction." *Walsh*, 125 A.3d at 1254–55 (citation omitted). "The statutory standard to obtain testing requires more than conjecture or speculation; it demands a *prima facie* case that the DNA results, if exculpatory, would establish actual innocence." *Id.*; *see also Commonwealth v. B. Williams*, 35 A.3d 44, 50-51 (Pa. Super. 2011). Further, "this Court has repeatedly held that the mere absence of a defendant's DNA, by itself, does not satisfy the 'actual innocence' requirement under section 9543.1(d)(2)(i)." *Commonwealth v. Tyler*, 234 A.3d 750, 754 (Pa. Super. 2020) (footnote and citations omitted).

Appellant's argument is flawed. Appellant views the facts in his favor, rather than the light most favorable to the Commonwealth as verdict winner. *See* Appellant's Brief at 4-25. Moreover, while Appellant argues that newer DNA testing is more accurate, he fails to articulate why results from newer testing would be probative. *See id.* at 36-44. Most importantly, Appellant fails to explain how the results of DNA testing would demonstrate his actual innocence. *See id.*

The record reveals considerable circumstantial evidence of Appellant's guilt. As discussed above, Appellant was the last person seen with the Victim after he and the Victim clocked out of work at approximately 11:30 P.M. The Victim's car containing her body was moved from the loading dock between 11:30 P.M. and midnight. Appellant set the Erisco alarm at 11:52 P.M., and forensic evidence, specifically the dirt on the Victim's clothing, indicated she was strangled inside the factory.

Appellant requests testing on evidence taken from the Victim's body, car, and debris in the area surrounding the car. Appellant's Brief, at 36-40; Petition for Post-Conviction DNA Testing, 7/15/20, at 18-19. However, Appellant fails to establish the relevance of such evidence, where trial testimony established the Victim was killed at the factory, not in the area where her car was moved. Also, as Appellant's counsel demonstrated by questioning various witnesses, the area around the Victim's car was trash-strewn, frequented by prostitutes and customers, and used for parking by

tenants of nearby buildings. Appellant fails to show a compelling nexus between the requested testing and the murder. Notably, the trial court had excluded evidence of prior crimes/criminals in the area unless Appellant could connect the evidence to the murder. Appellant failed to do so. **See Hardy**, **supra** at 15-17 (affirming the trial court's exclusion of the evidence).

As underscored at trial, both the exterior and interior of the Victim's car, including the Victim's car keys, were contaminated by at least two of the three individuals who found her body, as well as emergency personnel and police. N.T., 4/19/96, at 192-98; N.T., 4/23/96, at 108-11, 244-45, 248; N.T., 4/24/96, at 23, 31. While the presence of Appellant's DNA would be inculpatory, its absence would not be exculpatory. **See Tyler**, **supra**. As for items inside the car, some had spilled from the Victim's purse. N.T., 4/19/96, at 195-98; N.T., 4/23/96, at 108-10, 248. Appellant showed no nexus between the remaining materials (such as used tissues, an ad from a pizza restaurant, and an empty soda can) and the murder.

As to the remaining items: the Victim's fingernail clippings, clothing, rape kit, garage-door bolt, and twine used to strangle the Victim, Appellant likewise failed to establish that testing (or re-testing) would establish a *prima facie* case of innocence. The Victim's current boyfriend testified he and the Victim had sex the day of the murder, which DNA testing confirmed. N.T., 4/23/96, at 114. Testing of fingernail scrapings showed only the Victim's DNA,

and the forensic evidence, at best, was ambiguous as to whether the Victim sustained defensive injuries. N.T., 4/22/96, at 214-16.

With respect to the garage door bolt, the twine, and the Victim's clothes, neither the presence nor absence of Appellant's DNA would be meaningful. Many people, including Appellant, touched the garage door bolt when opening and closing the door at the loading dock. *See* N.T., 4/19/96, at 94, 207, 209; N.T., 4/23/96, at 41, 50. Trial testimony also demonstrated the twine could be found on the floor of the factory, in boxes near the loading dock, and was touched by many people. *See* N.T., 4/23/96, 35-37, 47, 54-55, 193-96, 204-05. The testimony also highlighted that employees regularly wore protective gear, including gloves. N.T., 4/22/96, at 81-82, 89, 106, 108; N.T., 4/23/96, at 188, 224. Appellant was seen wearing gloves the evening of the murder; thus, the absence of his DNA would not demonstrate his actual innocence. *See* N.T., 4/22/96, at 81-82, 89, 106, 108; N.T., 4/23/926, at 188, 244; *see also Tyler*, 234 A.3d at 754. As Appellant offers only "conjecture and speculation," he cannot establish a *prima facie* case of actual innocence. Accordingly, the trial court did not err in finding Appellant failed to meet the requirements of §§ 9543.1(c)(3) and 9543.1(d)(2). *See Walsh*, 125 A.3d at 1254–55.

Accordingly, after careful consideration and review, we discern no error in the trial court's factual findings and legal conclusions. We thus affirm the

denial of Appellant's petition seeking post-conviction DNA testing,[4] and deny

Appellant's petition for remand.

Petition for remand denied. Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/30/2022

---

[4] Because of our disposition of Appellant's first two issues, we decline to address his third issue concerning the trial court's denial of his petition without a hearing.