J-S06036-23

2023 PA SUPER 69

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| RAYMOND CHARLES ROWE | : | |
| | : | |
| Appellant | : | No. 649 MDA 2022 |

Appeal from the PCRA Order Entered April 21, 2022
In the Court of Common Pleas of Lancaster County Criminal Division at
No(s): CP-36-CR-0004108-2018

BEFORE: STABILE, J., NICHOLS, J., and STEVENS, P.J.E.[*]

OPINION BY STEVENS, P.J.E.: **FILED: APRIL 18, 2023**

Raymond C. Rowe ("Appellant") appeals from the order entered in the Court of Common Pleas of Lancaster County denying his motion for post-conviction DNA testing, filed pursuant to 42 Pa.C.S.A. § 9543.1 of the Post Conviction Relief Act ("PCRA"), in which he requested DNA collection and testing of potential Touch DNA samples from various items recovered from the murder scene of his victim. After careful consideration, we affirm.

The present matter stems from the December 21, 1992, rape and murder of Christi Mirack in her Lancaster County home. During her autopsy, swabs were taken from her body and sent to the Pennsylvania State Police for testing. Although a DNA profile was obtained and uploaded into a nationwide database of offenders and unknown subjects, nearly 26 years would pass until a match was found.

_____

[*] Former Justice specially assigned to the Superior Court.

Specifically, on May 19, 2018, Appellant was identified as a strong viable suspect after a genetic analysis of the DNA profile collected from the carpet sample provided a significant match to a national database sample belonging to him. Affidavit of Probable Cause at ¶ 24. The Pennsylvania State Police initiated an undercover investigation of Appellant that included a surreptitious acquisition and DNA testing of a water bottle and chewing gum he had used and discarded. The DNA results matched those obtained from the sperm fraction found on the carpet. Subsequent testing of swab samples of semen and sperm taken from Ms. Mirack's body showed all samples came from one contributor and matched the DNA profile taken from the water bottle and chewing gum. *Id.* at ¶¶ 26-29. A final, post-arrest DNA profile obtained from a buccal swab of Appellant also matched DNA taken from the carpet and swabs from Ms. Mirack's body.

The PCRA court sets forth the pertinent post-arrest facts and procedural history, as follows, with this Court's supplementation provided in brackets:

> On January 8, 2019, the Petitioner-Appellant tendered a guilty plea [pursuant] to a negotiated plea agreement. The Petitioner pleaded guilty to Criminal Homicide, three (3) counts of Rape by Forcible Compulsion, two (2) counts of Involuntary Deviate Sexual Intercourse—Forcible Compulsion, and Burglary. 18 Pa.C.S.A. §§ 2501(a); 3121(1); 3123(A-1); and 3502(A), respectively. The Court accepted the negotiated plea agreement and the [Petitioner-Appellant] received life in prison without the possibility of parole with a consecutive period of incarceration of sixty (60) to one hundred and twenty (120) years pursuant to the terms negotiated in the plea agreement. . . . No direct appeal to the Superior Court was filed. The Petitioner's sentence became final on February 8, 2019.

On November 21, 2020, the [Petitioner-Appellant], through his attorney, filed an untimely Motion for Post-Conviction Relief ("PCRA") and a Post-Conviction DNA Testing Petition. Although the PCRA Petition was filed nine (9) months beyond the PCRA time requirement pursuant to 42 Pa.C.S.A. § 9545(b), the one-year time bar does not apply to motions for the performance of forensic DNA testing. 42 Pa.C.S.A. § 9543.1. [1]

. . .

[Specifically, [Petitioner-Appellant]'s motion for DNA testing sought Touch DNA testing on several items recovered from the murder scene in Ms. Mirack's home. These items included a wooden cutting board believed to have been used to batter the victim, a toaster that was typically placed atop the cutting board and presumably moved by the assailant, and items of Ms. Mirack's clothing that were forcibly removed from her body during the apparent rape and/or used to asphyxiate her.]

The PCRA Court held an evidentiary hearing [on [Petitioner-Appellant]'s motion for Post-Conviction DNA testing] that spanned three days: August 26, 2021, September 2, 2021, and September 8, 2021.

. . .

[At the DNA hearing, the following relevant facts regarding the 1992 murder were recounted:]

> On . . . December 21, 1992, [the victim, Ms. Christy Mirack, was found dead in her home.] Ms. Mirack's roommate [had] left the residence [earlier that morning] at 7:00 a.m. for work[, after observing Ms. Mirack getting ready to head to work and preparing Christmas presents for her co-workers and students. N.T. 1/8/9, at 6;] Affidavit of Probable Cause at ¶ 14.

---

[1] In **Commonwealth v. McLaughlin**, 835 A.2d 747 (Pa. Super. 2003), we explained that a motion for DNA testing under section 9543.1 was not a PCRA petition but, instead, a separate instrument that "allows for a convicted individual to first obtain DNA testing which could then be used within a PCRA petition[.]" **Id.** at 750, quoting **Commonwealth v. Weeks**, 831 A.2d 1194, 1196 (Pa. Super. 2003). Accordingly, such a motion is not subject to the PCRA's one-year time bar for petitions under Section 9545. **Accord Commonwealth v. Tyler**, 234 A.3d 750, 753 (Pa. Super. 2020).

Neighbors heard "a high pitched, unexpected scream" coming from Ms. Mirack's apartment between 7:10 and 7:20 am. *Id*. at ¶ 15. At around 9:20 a.m., Lancaster County-Wide Communications received a phone call from [the Principal of Ms. Mirack's school] who arrived at her home to perform a wellness check due to her absence from work and found her unconscious on the living room floor. *Id*., at ¶ 5-7. Within minutes, first responders arrived at the residence and observed Ms. Mirack lying on her back with facial injuries, clearly deceased with a wooden cutting board located next to her head. *Id.* at ¶ 10. Packages were strewn about the foyer and living room area which is consistent with a struggle taking place just in front of the front door of the residence. *Id.* at ¶ 13.

Upon further observation, the clothes on [Ms. Mirack's] torso were pushed upwards on her body and the only piece of clothing [she] was wearing from the waist down was socks. *Id.* at ¶ 10. Ms. Mirack's pants had likely been forcibly removed as evidenced by the inside button laying on the floor near her body. *Id.* at ¶ 12. Notably, among the limited amount of clothing that she was still wearing was a brown leather jacket and burgundy gloves; a factor that led investigators to opine that she was attacked as she was preparing to leave her home. *Id.* at ¶ 13.

An autopsy was then conducted the following day on December 22, 1992, by Dr. Wayne Ross, Forensic Pathologist of Lancaster County. *Id*. Dr. Ross determined that the abrasions and bruising on Ms. Mirack's lower body were consistent with being a victim of sexual assault. *Id.* at ¶ 16. Sperm and semen were also found on and in her body. *Id*. Several swabs collected from Ms. Mirack's body during the autopsy, including but not limited to vaginal, anal, oral, back, and leg swabs, as well as [section of carpet appearing stained with bodily fluids directly below Ms. Mirack's body] were packaged and sent to the Pennsylvania State Police DNA Laboratory for DNA analysis. *Id.* at ¶ 17. Dr. Ross ruled Ms. Mirack's cause of death as strangulation and the manner of death as a homicide. *Id.* at ¶ 16.

Upon review of discovery and the autopsy report, trial counsel also opined [at the DNA hearing] that [the defense team had concluded] that a sexual assault had occurred. Specifically, when asked on direct examination if the [defense team determined that] discovery supported the theory of consensual sex between Ms. Mirack and the [Petitioner-Appellant], trial counsel answered, "no, not that we determined." N.T., DNA Hearing, 9/2/21, at 151. On cross-examination, when asked about Defense theories and the discovery in this case, trial counsel again stated that "consensual doesn't seem really compatible with the absolute beating and trauma that [Ms. Mirack] suffered." N.T. at 170-71.

. . .

[Regarding Appellant's alleged confession, the record reflects that the] day after the [Petitioner-Appellant]'s arrest on June 26, 2018, a capital case team assembled by the Defender Association that consisted of three attorneys, a paralegal, and an investigator went to the prison to meet with the [Petitioner-Appellant]. N.T. at 140, 142. While discussing the circumstances of his arrest in a private room within the prison, the [Petitioner-Appellant] [indicated to the Defender Association investigator that he was in a relationship with Ms. Mirack and that one morning before work he went to her apartment where they began having sex. (Def. DNA Exhibit 13, at 4). At some point, however, Ms. Mirack wanted the sexual encounter to stop. (Def. DNA Exhibit 13, at 4). According to the investigator, when Appellant reached that point in describing his encounter with Ms. Mirack, he simply stated,] "I snapped. I just snapped." N.T. at 123-124, 126. This confession was then disclosed to trial counsel immediately after the interview and then memorialized in the investigator's report written the following day. N.T. at 133-34, 138.

[Petitioner-Appellant] himself at the DNA hearing explained that the reason why he was going to see Ms. Mirack on the morning of her murder was to not only have sex but also break things off. N.T., DNA Hearing, 8/26/21, at 55. [the Defender Association investigator's] report also indicates the [Petitioner-Appellant] told him that on the day of Ms. Mirack's murder, his intention was to speak with her in hopes of breaking it off between them. N.T., DNA Hearing, 9/2/21, at 132. Specifically, the [Petitioner-Appellant] informed [the Defender Association investigator] that he was upset that Ms. Mirack was going to tell his wife about the affair and he went to her home to break things off. N.T. at 133.

Trial counsel also testified that on several occasions the [Petitioner-Appellant] indicated to him personally as well as co-counsel that he was guilty of this offense. N.T. at 145. The [Petitioner-Appellant] indicated his guilt with counsel during case discussions when he explained he and Ms. Mirack had a consensual, ongoing relationship, and "he did it and he snapped." *Id*. Although the [Petitioner-Appellant] now denies the confession, the description provided by trial counsel at the DNA hearing as well as in reports conducted the day after his arrest mirror some of the same details provided by the [Petitioner-Appellant] himself.

. . .

[At the DNA hearing, testimony indicated that] [i]n the days leading up to [Petitioner-Appellant]'s guilty plea, trial counsel informed the [Petitioner-Appellant] of what was going to be said at the hearing and provided guidance on what he should expect from the process. N.T. at 158. Trial counsel described the [Petitioner-Appellant] as a person who is "very bright" and "engaging" and a person who is "very calculating and weighs options." N.T. at 146. Counsel also stated that the [Petitioner-Appellant] was frightened by the possibility and certainty of a death notice being filed and was concerned about the living conditions of death row. *Id*.

[In considering Petitioner's petition for DNA testing, the PCRA court also factored statements made at] Appellant's guilty plea hearing. Prior to the plea acceptance, the Petitioner acknowledged that he understood all of the charges he was pleading guilty to and he understood that the Commonwealth would have to prove he committed each charge beyond a reasonable doubt. N.T., 1/8/19, at 4-6. Petitioner also acknowledged that he signed the last page of the guilty plea colloquy form. N.T. at 14.

The Commonwealth then read aloud a comprehensive recitation of the facts of the case that included the following: "and [Ms. Mirack] never showed up for work because shortly after [her roommate] left the apartment the defendant forced his way into her home, attacked her, physically attacked her, sexually assaulted her both anally, vaginally, and orally with his penis and then strangled her causing her death." N.T. at 7. The Commonwealth further informed the trial court that at the time of the offense, the Petitioner was living four (4) miles away from Ms. Mirack and was working at a company located down the road from

- 6 -

her residence. N.T. at 10-11. Finally, the Commonwealth stated that multiple witnesses saw a car that matched the description of the Petitioner's vehicle the morning of the murder. N.T. at 11.

. . .

When given the opportunity to address the court [at the guilty plea], trial counsel stated, "He is here. He has admitted that he did it. He's told us, he has told other people since his arrest that he, in fact, is guilty of this charge." N.T. at 18. Counsel further commented, "he is here today saying, I am the one who did this. Back then I was not the same person that I am now." *Id*. Following statements made by counsel, the Petitioner voluntarily addressed the court and stated, "I'd like to apologize to the Mirack family. . . . And to the family, I can't imagine what you're going through. I apologize." N.T. at 22.

. . .

At the conclusion of the [Post-Conviction DNA Testing] hearing, the PCRA Court ordered both parties to file briefs[, and both parties complied].

PCRA Court Opinion, 4/21/22, at 1-2, 10-11, 12, 13.

By the PCRA Court's Order of April 12, 2022, it denied Appellant's motion for Post-Conviction DNA Testing. First, it determined that Appellant failed to meet the statutory threshold requirements of Section 9543.1(a)(2), *see infra*, because he had never attempted to test the items prior to his guilty plea despite the availability of effective Touch DNA collection methods and analysis. The PCRA court reasoned that even assuming the requested Next Generation Sequencing ("NGS") test that Appellant seeks is better able to distinguish between multiple contributors in a DNA sample than is the standard STR test, neither his expert witness nor the Commonwealth's could assert definitively that NGS would represent a more reliable or advantageous test compared to STR under the circumstances of this case because the items had never been

tested in the first place. As such, the PCRA court concluded that Appellant failed to establish that effective Touch DNA collection and analysis of the items in question was unavailable at the time of his guilty plea.

In the alternative, the PCRA court concluded that Appellant had failed to carry his burden under Section 9543.1(c)(3)(ii)(A) of presenting a *prima facie* case that the requested DNA testing of the specific evidence, assuming exculpatory results, would establish his actual innocence.[2] In this regard, the PCRA court explained:

> The Petitioner baldly asserts his actual innocence, however, the foundation of this claim rests on baseless excuses and denials that have been conjured up, years later, for his benefit. Petitioner alleges that he is not on a fishing expedition and "the items to be tested in this case could conclusively establish who the real perpetrator of these crimes is." Petitioner's Motion in Support of DNA Testing, November 30, 2021, p. 26. At least five (5) other suspects, however, were investigated and all were cleared via DNA through testing of the blood and semen in the living room area. ***Id.*** at 169-70.
>
> A murder suspect may be convicted on wholly circumstantial evidence. ***Commonwealth v. Heilman***, 867 A.2d 542, 547 (Pa. Super. 2005). The trial court in the instant matter is satisfied that

---

[2] The PCRA court properly observed that Section 9543.1(c)(3)(ii)(A) is reinforced by Section 9543.1(d)(2)(i), which provides in relevant part:

(2) The court shall not order the testing requested in a motion under subsection (a) if, . . . after review of the record of the applicant's guilty plea, the court determines that there is no reasonable probability[] that the testing would produce exculpatory evidence that: (i) would establish the applicant's actual innocence of the offense for which the applicant was convicted . . . .

42 Pa.C.S.A. § 9543.1(d)(2)(i).

there is no reasonable probability that DNA testing would produce the exculpatory evidence needed to establish the Petitioner's claim of actual innocence. Upon review of the record and consideration of the circumstantial evidence of the crime scene, the Petitioner's multiple confessions, and the non-disputed facts and apology at the guilty plea, the trial court finds that the Petitioner's claim of actual innocence is not satisfied.

PCRA Court Opinion, at 9

In this timely appeal, Appellant raises two questions for this Court's consideration:

1. Did the PCRA Court err by concluding that Appellant had not made a showing that his actual innocence could be established by DNA testing of specific items pursuant to 42 Pa.C.S. § 9543.1?

2. Did the PCRA Court err by concluding that the newly formulated methods for conducting "touch DNA" analysis and "Next Generation" testing do not satisfy the requirements of 42 Pa.C.S. § 9543.1?

Brief of Appellant, at 4.

Our standard of review in this case is as follows:

Generally, the trial court's application of a statute is a question of law that compels plenary review to determine whether the court committed an error of law. When reviewing an order denying a motion for post-conviction DNA testing, this Court determines whether the movant satisfied the statutory requirements listed in Section 9543.1. We can affirm the court's decision if there is any basis to support it, even if we rely on different grounds to affirm.

*Commonwealth v. Walsh*, 125 A.3d 1248, 1252–53 (Pa. Super. 2015) (citation omitted).

We begin by addressing Appellant's second issue, as it is dispositive of the present appeal. Requests for post-conviction DNA testing are governed by statute at 42 Pa.C.S.A. § 9543.1(a) which sets forth, *inter alia*, three

alternative threshold requirements that an applicant must establish to obtain requested DNA testing:

**§ 9543.1. Postconviction DNA testing**

**(a) Motion.**—

(1) An individual convicted of a criminal offense in a court of this Commonwealth and serving a term of imprisonment or awaiting execution because of a sentence of death may apply by making a written motion to the sentencing court for the performance of forensic DNA testing on specific evidence that is related to the investigation or prosecution that resulted in the judgment of conviction.

(2) The evidence may have been discovered either prior to or after the applicant's conviction. The evidence shall be available for testing as of the date of the motion. If the evidence was discovered prior to the applicant's conviction, the evidence shall not have been subject to the DNA testing requested because the technology for testing was not in existence at the time of the trial or the applicant's counsel did not seek testing at the time of the trial in a case where a verdict was rendered on or before January 1, 1995, or the evidence was subject to the testing, but newer technology could provide substantially more accurate and substantially probative results, or the applicant's counsel sought funds from the court to pay for the testing because his client was indigent and the court refused the request despite the client's indigency.

42 Pa.C.S.A. § 9543.1(a).

Our jurisprudence interpreting subsection 9543.1(a)(2) has recognized that an applicant's motion for DNA testing of evidence discovered prior to the applicant's conviction meets the threshold requirement with respect to untested evidence only if "it was not already DNA tested because (a) technology for testing did not exist at the time of the applicant's trial; (b) the applicant's counsel did not request testing in a case that went to verdict before

January 1, 1995; or (c) counsel sought funds from the court to pay for the testing because his client was indigent, and the court refused the request despite the client's indigency. ***Commonwealth v. Williams***, 35 A.3d 44, 49 (Pa. Super. 2011). ***See also Walsh***, 125 A.3d at 1254 (quoting ***Commonwealth v. Perry***, 959 A.2d 932 (Pa. Super. 2008) (holding PCRA counsel was not ineffective for declining to pursue post-conviction DNA testing where technology for testing existed at time of trial, verdict came after January 1, 1995, and court had not refused request for funds for testing; consequently, appellant could not have met his threshold burden under Section 9543.1(a)(2)).

Herein, Appellant posits that the requested Touch DNA collection and testing methods are presently accepted as sound science in criminal forensics but were not available at the time of his 2019 guilty plea. At the PCRA hearing, Appellant advanced this position through the expert testimony of Ms. Katherine Cross, a forensic biologist and the technical DNA leader at Guardian Forensic Sciences in Abington, PA.

According to Ms. Cross, the requested Touch DNA *collection* method, called "combination method", relates to how skin cells are gathered for traditional Short Tandem Repeat, or "STR", analysis. The "combination method" of collecting skin cells simply takes collection methods such as scraping, vacuuming, or swabbing that traditionally have been used in

isolation and now employs them together at the outset to gather a larger sample of cells for testing. N.T., 8/26//21, at 17-20.

On cross-examination, however, Ms. Cross clarified that "the combination method" really does not constitute a new method but simply applies multiple existing methods together at the beginning of a collection. N.T. at 46. Whereas the traditional process consists of employing each traditional collection method separately and then combining the samples at the end, the combination method applies all traditional methods at the beginning of the process to minimize interpretational issues when conducting analysis. N.T. at 46-47.

The requested Touch DNA *testing* method addressed by Ms. Cross is Next-Generation Sequencing, or NGS, which goes beyond the traditional STR testing of a DNA fragment. Whereas STR looks at DNA fragment repeats to determine identity, NGS testing looks at the building block base pairs within the repeats and sequences them. According to Ms. Cross, NGS enables the analyst to differentiate between contributors to a Touch DNA sample: "So what [NGS] allows us to do is potentially determine more accurately the number of contributors to a sample and if there are any differences in those contributors so that we don't have this problem of overlapping like we have now [with STR]." N.T. at 21.

Ms. Cross agreed, however, that in 2018 and 2019 Touch DNA STR testing "was being utilized in cases effectively" and was available to Appellant

and his defense team to use on all relevant crime scene items. N.T. at 35. She also conceded that NGS is not needed in a case where there are strong DNA links available, and she opined that traditional STR testing is reliable in testing samples involving two contributors and even three contributors where one contributor is prominent. N.T. at 36. When asked whether NGS is indicated in every case, she answered, "Oh, absolutely not." N.T. at 36, 42.

In further testimony, Ms. Cross stated that "the only technological improvement in Touch DNA testing was the approval and acceptance of the next-generation sequencing technology for samples that have low levels of DNA." N.T., 9/8/21 at 271. She added that compared to a body fluid sample, there is significantly less DNA in a touch sample. N.T. at 272. Asked if NGS is something that could be useful in a case like the present one, Ms. Cross replied, "It could be. It's – any testing, the best you could say is it could be[,] until you see what the results are. It is available and is another technology that can be used." N.T. at 273.

The Commonwealth's cross-examination of Ms. Cross sought to develop further the discussion regarding when a NGS test is appropriate, asking Dr. Cross whether NGS testing "would have, again, only been implicated should they not have been able to get a good STR result?" N.T. at 275. Dr. Cross answered,

> [NGS] is something that can either supplement STR results that were partial, or it is something that can be used for low level in place of STR. If you have a good solid STR result, then, no, you would not need to proceed to the next generation sequencing.

. . .

> With Touch DNA samples, I would expect it to be low-level and potentially partial profiles, not full independent profiles.

N.T. at 276.

The PCRA court followed up on this answer by asking questions that underscored how the lack of any STR testing on the items in question impaired her ability to opine whether NGS would have been needed in this case:

> **PCRA Court**: . . . I understand what you're saying is if these items had been submitted in 2018 and for whatever reason they were not able to obtain samples that readily resulted in a DNA profile being obtained, that there is [sic] scientific advances since then that might enable somebody to get a sequence from them today?
>
> **Ms. Cross**: That's correct.
>
> **PCRA Court**: But we don't know whether or not DNA could have been obtained from any of them because they've [the items] never been submitted for analysis?
>
> **Ms. Cross**: That's correct.

N.T. at 276-277.

The Commonwealth's expert, Michael Biondi, the Quality Assurance Program manager for the Pennsylvania State Police Forensic DNA Division, also answered the PCRA court's questions regarding the significance of the absence of prior Touch DNA testing of the items in question:

> **Mr. Biondi**: I'm not entirely sure, because all of those items could have been tested with STR technology, the same technology we're using that's widely in use in the forensic community now.

N.T at 267.

In that respect, Mr. Biondi noted that Appellant's lawyers could have submitted the items for reliable Touch DNA testing but elected not to do so. N.T. at 269. When the PCRA court asked him if there was anything newly available that would make Touch DNA testing any more productive in this case than it would have been back in 2018, Mr. Biondi answered, "Not to my knowledge, but it's hard to say because you don't know what the results of the testing would have been." N.T. at 269.

On this record, we discern no error with the PCRA court's determination that Appellant failed to meet the threshold requirement of establishing the unavailability of effective DNA collection and testing capable of producing probative results under the circumstances at the time he pleaded guilty. STR technology for testing Touch DNA samples inarguably was in existence, effective, and known to Appellant and his team of defenders at the time of Appellant's plea, *see* N.T., 9/2/21, at 120-21, but they elected to forego such testing.[3] In addition, Appellant failed to establish that the STR technology

_____

[3] Indeed, one counsel on Appellant's Defender team insinuated that incriminating circumstantial evidence militated against sending the items out for testing, suggesting by analogy that if an arrested client threw a gun on the ground and the prosecution did not send it out for testing, "I am not going to ask the DA's Office to send that gun out to be tested because I don't want my client's DNA to be found on it. So that's a strategic decision that I would make that I would say I'd be really careful about whether or not I was going to do that." N.T., 9/2/21, at 195-96. This statement dovetailed with testimony from other counsel who acknowledged concern amongst themselves and Appellant about the accumulation of inculpatory evidence and its potential to prompt a Commonwealth decision to pursue a capital trial. N.T. 9/2/19 at 146, 151, 170-171.

available at the time of his plea would have produced inferior results compared to the requested NGS technology, as both experts conceded they could only speculate about the quantity and quality of the Touch DNA samples capable of collection from the items since no testing had been attempted.

This rationale aligns with relevant decisions of this Court. For instance, in **Commonwealth v. Hardy**, 2022 PA Super 54, 274 A.3d 1240, 1251 (2022), *reargument denied* (June 7, 2022), *appeal granted*, No. 185 WAL 2022, 2022 WL 17827949 (Pa. Dec. 21, 2022),[4] the applicant Hardy was tried by jury in 1998 and convicted of first-degree murder for the death-by-strangulation of his co-worker and former girlfriend (the "Victim") at their worksite. Nearly 20 years after his judgment of sentence was affirmed and his collateral appeal denied on the merits, Hardy filed a 2020 motion for Post-Conviction DNA testing in which he sought to apply new and allegedly more probative DNA technology to re-test previously tested items and test never-before-tested items found in and around the Victim's car. **Id.** at 1245.

The PCRA court denied Hardy's petition without a hearing. With respect to the untested items, and despite the applicant Hardy's claim of newer technology that would render more probative results, the PCRA court opined

_____

[4] On December 21, 2022, the Pennsylvania Supreme Court issued a *per curiam* order granting allowance of appeal on three issues, including the issue asking, "Did Appellant satisfy the requirements of 42 Pa.C.S. § 9543.1(a)(2), with regard to evidence previously tested for DNA and evidence not previously tested for DNA?".

that Appellant had not met the threshold requirements. It noted that the items were all known before trial, effective DNA testing was available at the time of trial, the verdict was rendered after January 1, 1995, and the court did not refuse funds for DNA testing. *Id.* at 14.

On appeal, Hardy asked, *inter alia*, whether the trial court erred with respect to never-before-tested evidence when it concluded that he did not meet the threshold requirement of 42 Pa.C.S.A. § 9543.1(a)(2). Hardy argued that using newer DNA technology to test the "never-before-tested evidence ... could yield the identity of the true perpetrator in this case." *Id.* at 1249. On this issue, we affirmed the trial court without further discussion, stating that we discerned no error with the trial court's factual findings and legal conclusions after careful consideration and review.[5]

In **Walsh**, the applicant was tried and convicted in 2004 of aggravated assault and related offenses for attacking his wife with a claw hammer in the presence of witnesses, who testified Appellant had landed several hammer blows to his wife's head. After several failed direct and collateral appeals, the applicant filed a 2014 PCRA petition seeking post-conviction DNA testing under Section 9543.1(a)(2). The crux of his petition was that testing would reveal an absence of his wife's DNA on the hammer, which result, he maintained,

---

[5] The **Hardy** decision went on to address and reject on the merits the applicant's claim that he had established a *prima facie* case of actual innocence as set forth in Section 9543.1(c)(3) and reinforced in Section 9543.1(d)(2). *Id.* at 1250-51.

would establish he did not directly strike his wife and thus prove his "actual innocence" on the charge of aggravated assault.

Upon review of the record, this Court determined Appellant had failed to meet the threshold requirements as needed to obtain relief under Section 9543.1, as he had not subjected the hammer to available DNA testing at the time of trial:

> Instantly, [Walsh's] trial took place on May 6–7, 2004. At trial, the Commonwealth introduced testimony concerning [Walsh's] assault on Victim using a claw hammer and admitted into evidence the hammer used in the attack. Thus, the evidence [Walsh] seeks to have DNA tested was discovered and available before [Walsh's] trial. Additionally, DNA testing technology was available at the time of [Walsh's] trial in 2004, the jury reached its verdict after January 1, 1995, and the court did not refuse a request for funds for DNA testing. Consequently, [Walsh] is unable to satisfy the threshold requirements necessary to obtain post-conviction DNA testing. **See** 42 Pa.C.S.A. § 9543.1(a)(2); **B. Williams**, **supra**; **Perry**, **supra**.

**Walsh**, 125 A.3d 1248, 1257 (Pa. Super. 2015).

Most recently in **Commonwealth v. Goyette**, 287 A.3d 869 (Table), 282 WDA 2022 (unpublished memorandum) (Pa. Super. filed October 17, 2022),[6] a three-judge panel of this Court upheld a PCRA court's order denying the applicant Goyette's 2021 request for DNA testing of two previously untested blood-covered items—his steering wheel cover and a pair of sneakers

---

[6] Under amended Pa.R.A.P. 126, non-precedential decisions are not binding but may be cited as "persuasive" authority. **See** Pa.R.A.P. 126(b)(2) (stating that unpublished non-precedential decisions of the Superior Court filed after May 1, 2019, may be cited for their persuasive value).

found in his apartment house's dumpster—recovered by investigators shortly after his 2005 brutal attack of an elderly victim. Goyette contended that testing would reveal the absence of his DNA from the items and, therefore, lend support to his claim of actual innocence. The Commonwealth filed a response arguing, *inter alia*, that Goyette was not entitled to further DNA testing because testing was available at the time of his trial and he chose to forego it.

In affirming the PCRA court's order, our panel found that Goyette's failure to establish any of the alternative threshold requirements of Section 9543.1(a)(2), alone, provided grounds to deny his motion for DNA testing. Of particular note for our purposes was the observation that Goyette could not obtain requested testing with purportedly more reliable new methods of testing because he had not sought available DNA testing on such items previously:

> Goyette has not established any of these requirements. Technology for DNA testing was undisputedly in existence by the time of his 2007 trial, as items of evidence were submitted for testing and introduced at his trial. His trial took place well after the January 1, 1995, cut-off date for testing items when trial counsel failed to previously request it. *The inner portion of the sneakers and the steering wheel cover were not previously subjected to testing, so he may not seek additional testing on the basis that new methods are more reliable.* Finally, the record reveals that he did not previously file a motion for DNA testing that was denied despite his indigency. As Goyette cannot meet any of Section 9543.1(a)(2)'s threshold requirements, the PCRA court was entitled to deny the petition on this basis alone.

**Goyette**, 287 A.3d 869 at **2 (emphasis added).

Consistent with this jurisprudence, we conclude Appellant has failed to meet the threshold requirement under Section 9543.1(a)(2) that the items proposed for testing were not already DNA tested because technology for testing did not exist at the time of his guilty plea. The record established that Appellant was aware of the items, that they could have undergone the STR method of Touch DNA testing that has proven effective, and that expert opinion refrained from positing that the STR method would have been inadequate so as to require recently available NGS Touch DNA analysis. For these reasons, we affirm the order of the PCRA court denying Appellant's motion for Post-Conviction DNA testing.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/18/2023