J-S06036-23          2026 PA Super 13

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
                                                  :             PENNSYLVANIA
                                                  :
                v.                                 :
                                                  :
                                                  :
RAYMOND CHARLES ROWE               :
                                                  :
              Appellant                     :    No. 649 MDA 2022

Appeal from the PCRA Order Entered April 21, 2022
In the Court of Common Pleas of Lancaster County Criminal Division at
No(s):  CP-36-CR-0004108-2018

BEFORE:   STABILE, J., NICHOLS, J., and STEVENS, P.J.E.[*]

OPINION BY STEVENS, P.J.E.:          **FILED: JANUARY 22, 2026**

This matter returns to us by the Pennsylvania Supreme Court's order of remand directing this Court to continue review pursuant to its decision in ***Commonwealth v. Hardy***, 337 A.3d 385 (Pa. filed June 17, 2025). Specifically, our high court applied its rationale in ***Hardy*** to reject this panel's determination that applicant Raymond Charles Rowe's application for DNA Testing under 42 Pa.C.S.A. § 9543.1, ***see infra***, was untimely.   Pursuant to that decision and remand order, we address Applicant Rowe's remaining question asking whether the trial court improperly denied his request for DNA testing based on an erroneous determination that he failed to make the requisite *prima facie* case of his "actual innocence" of the crime for which he was convicted.  After careful review, we affirm.

---

[*] Former Justice specially assigned to the Superior Court.

This Court previously has set forth the pertinent facts and procedural history, as follows:

> The present matter stems from the December 21, 1992, rape and murder of [Christy] Mirack in her Lancaster County home. During her autopsy, swabs were taken from her body and sent to the Pennsylvania State Police for testing. Although a DNA profile was obtained and uploaded into a nationwide database of offenders and unknown subjects, nearly 26 years would pass until a match was found.
>
> Specifically, on May 19, 2018, Appellant [Rowe] was identified as a strong viable suspect after a genetic analysis of the DNA profile collected from a carpet sample provided a significant match to a national database sample belonging to him. Affidavit of Probable Cause at ¶ 24. The Pennsylvania State Police initiated an undercover investigation of Appellant that included a surreptitious acquisition and DNA testing of a water bottle and chewing gum he had used and discarded. The DNA results matched those obtained from the sperm fraction found on the carpet. Subsequent testing of swab samples of semen and sperm taken from Ms. Mirack's body showed all samples came from one contributor and matched the DNA profile taken from the water bottle and chewing gum. *Id.* at ¶¶ 26-29. A final, post-arrest DNA profile obtained from a buccal swab of Appellant also matched DNA taken from both the carpet and swabs from Ms. Mirack's body.
>
> The [trial] court sets forth additional post-arrest facts and procedural history, as follows, with this Court's supplementation provided in brackets:
>
>> On January 8, 2019, [Appellant] tendered a guilty plea [pursuant] to a negotiated plea agreement. [Appellant] pleaded guilty to Criminal Homicide, three (3) counts of Rape by Forcible Compulsion, two (2) counts of Involuntary Deviate Sexual Intercourse— Forcible Compulsion, and Burglary. 18 Pa.C.S.A. §§ 2501(a); 3121(1); 3123(A-1); and 3502(A), respectively. The [trial court] accepted the negotiated plea agreement and [Appellant] received life in prison without the possibility of parole with a consecutive period of incarceration of sixty (60) to one hundred and twenty (120) years pursuant to the terms

negotiated in the plea agreement. . . . No direct appeal to the Superior Court was filed. [Appellant's] sentence became final on February 8, 2019.

On November 21, 2020, [Appellant], through his attorney, filed an untimely Motion for Post-Conviction Relief ("PCRA") and a [Motion for] Post-Conviction DNA Testing []. Although the PCRA Petition was filed nine (9) months beyond the PCRA time requirement pursuant to 42 Pa.C.S.A. § 9545(b), the one-year time bar does not apply to motions for the performance of forensic DNA testing. 42 Pa.C.S.A. § 9543.1. [1]

. . .

[Specifically, Appellant]'s motion for DNA testing sought Touch DNA testing on several items recovered from the murder scene in Ms. Mirack's home. These items included a [wooden cutting board believed to have been used to batter the victim, a toaster that was typically placed atop the cutting board and presumably moved by the assailant, and items of Ms. Mirack's clothing that were forcibly removed from her body during the apparent rape and/or used to asphyxiate her].

The [trial] court held an evidentiary hearing [on Appellant's] motion for Post-Conviction DNA testing] that spanned three days: August 26, 2021, September 2, 2021, and September 8, 2021.

. . .

_____

[1] In **Commonwealth v. McLaughlin**, 835 A.2d 747 (Pa. Super. 2003), we explained that a motion for DNA testing under section 9543.1 was not a PCRA petition but, instead, a separate instrument that "allows for a convicted individual to first obtain DNA testing which could then be used within a PCRA petition[.]" **Id.** at 750, quoting **Commonwealth v. Weeks**, 831 A.2d 1194, 1196 (Pa. Super. 2003). Accordingly, such a motion is not subject to the PCRA's one-year time bar for petitions under Section 9545. **Accord Commonwealth v. Tyler**, 234 A.3d 750, 753 (Pa. Super. 2020).

[At the DNA hearing, the following relevant facts regarding the 1992 murder were recounted:]

On . . . December 21, 1992, [the victim, Ms. Christy Mirack, was found dead in her home.] Ms. Mirack's roommate [had] left the residence [earlier that morning] at 7:00 a.m. for work[, after observing Ms. Mirack make final preparations of Christmas presents for her co-workers and students before she planned to leave for school. N.T. 1/8/9, at 6;] Affidavit of Probable Cause at ¶ 14. Neighbors heard "a high pitched, unexpected scream" coming from Ms. Mirack's apartment between 7:10 and 7:20 am. *Id*. at ¶ 15. At around 9:20 a.m., Lancaster County-Wide Communications received a phone call from [the Principal of Ms. Mirack's school] who arrived at her home to perform a wellness check due to her absence from work and found her unconscious on the living room floor. *Id*., at ¶ 5-7. Within minutes, first responders arrived at the residence and observed Ms. Mirack lying on her back with facial injuries, clearly deceased with a wooden cutting board located next to her head. *Id.* at ¶ 10. Packages were strewn about the foyer and living room area which is consistent with a struggle taking place just in front of the front door of the residence. *Id.* at ¶ 13.

Upon further observation, the clothes on [Ms. Mirack's] torso were pushed upwards on her body and the only piece of clothing [she] was wearing from the waist down was socks. *Id.* at ¶ 10. Ms. Mirack's pants had likely been forcibly removed as evidenced by the inside button laying on the floor near her body. *Id.* at ¶ 12. Notably, among the limited amount of clothing that she was still wearing was a brown leather jacket and burgundy

gloves; a factor that led investigators to opine that she was attacked as she was preparing to leave her home. *Id.* at ¶ 13.

An autopsy was then conducted the following day on December 22, 1992, by Dr. Wayne Ross, Forensic Pathologist of Lancaster County. *Id*. Dr. Ross determined that the abrasions and bruising on Ms. Mirack's lower body were consistent with being a victim of sexual assault. *Id.* at ¶ 16. Sperm and semen were also found on and in her body. *Id*. Several swabs collected from Ms. Mirack's body during the autopsy, including but not limited to vaginal, anal, oral, back, and leg swabs, as well as [section of carpet appearing stained with bodily fluids directly below Ms. Mirack's body] were packaged and sent to the Pennsylvania State Police DNA Laboratory for DNA analysis. *Id.* at ¶ 17. Dr. Ross ruled Ms. Mirack's cause of death as strangulation and the manner of death as a homicide. *Id.* at ¶ 16.

Upon review of discovery and the autopsy report, trial counsel also opined [at the DNA hearing] that [the defense team had concluded] that a sexual assault had occurred. Specifically, when asked on direct examination if the [defense team determined that] discovery supported the theory of consensual sex between Ms. Mirack and [Appellant], trial counsel answered, "no, not that we determined." N.T., DNA Hearing, 9/2/21, at 151. On cross-examination, when asked about Defense theories and the discovery in this case, trial counsel again stated that "consensual doesn't seem really compatible with the absolute beating and trauma that [Ms. Mirack] suffered." N.T. at 170-71.

. . .

[Regarding Appellant's alleged confession, the record reflects that the] day after [Appellant]'s arrest on June 26, 2018, a capital case team assembled by the

Defender Association that consisted of three attorneys, a paralegal, and an investigator went to the prison to meet with [Appellant]. N.T. at 140, 142. While discussing the circumstances of his arrest in a private room within the prison, [Appellant] [indicated to the Defender Association investigator that he was in a relationship with Ms. Mirack and that one morning before work he went to her apartment where they began having sex. (Def. DNA Exhibit 13, at 4). At some point, however, Ms. Mirack wanted the sexual encounter to stop. (Def. DNA Exhibit 13, at 4). According to the investigator, when Appellant reached that point in describing his encounter with Ms. Mirack, he simply stated,] "I snapped. I just snapped." N.T. at 123-124, 126. This confession was then disclosed to trial counsel immediately after the interview and memorialized in the investigator's report written the following day. N.T. at 133-34, 138.

[Appellant] himself at the DNA hearing explained that the reason why he was going to see Ms. Mirack on the morning of her murder was to not only have sex but also break things off. N.T., DNA Hearing, 8/26/21, at 55. [the Defender Association investigator's] report also indicates the [Appellant] told him that on the day of Ms. Mirack's murder, his intention was to speak with her in hopes of breaking it off between them. N.T., DNA Hearing, 9/2/21, at 132. Specifically, [Appellant] informed [the Defender Association investigator] that he was upset that Ms. Mirack was going to tell his wife about the affair and he went to her home to break things off. N.T. at 133.

Trial counsel also testified that on several occasions [Appellant] indicated to him personally as well as co-counsel that he was guilty of this offense. N.T. at 145. [Appellant] indicated his guilt with counsel during case discussions when he explained he and Ms. Mirack had a consensual, ongoing relationship, and "he did it and he snapped." *Id*. Although [Appellant] now denies the confession, the description provided by trial counsel at the DNA hearing as well as in reports conducted the day after his arrest mirror some of the same details provided by [Appellant] himself.

. . .

[At the DNA hearing, testimony indicated that] [i]n the days leading up to [Appellant]'s guilty plea, trial counsel informed [Appellant] of what was going to be said at the hearing and provided guidance on what he should expect from the process. N.T. at 158. Trial counsel described [Appellant] as a person who is "very bright" and "engaging" and a person who is "very calculating and weighs options." N.T. at 146. Counsel also stated that [Appellant] was frightened by the possibility and certainty of a death notice being filed and was concerned about the living conditions of death row. *Id*.

[In considering Appellant's petition for DNA testing, the [trial] court also factored statements made at] Appellant's guilty plea hearing. Prior to the plea acceptance, [Appellant] acknowledged that he understood all of the charges he was pleading guilty to and he understood that the Commonwealth would have to prove he committed each charge beyond a reasonable doubt. N.T., 1/8/19, at 4-6. [Appellant] also acknowledged that he signed the last page of the guilty plea colloquy form. N.T. at 14.

The Commonwealth then read aloud a comprehensive recitation of the facts of the case that included the following: "and [Ms. Mirack] never showed up for work because shortly after [her roommate] left the apartment the defendant forced his way into her home, attacked her, physically attacked her, sexually assaulted her both anally, vaginally, and orally with his penis and then strangled her causing her death." N.T. at 7. The Commonwealth further informed the trial court that at the time of the offense, the [Appellant] was living four (4) miles away from Ms. Mirack and was working at a company located down the road from her residence. N.T. at 10-11. Finally, the Commonwealth stated that multiple witnesses saw a car that matched the description of [Appellant's] vehicle the morning of the murder. N.T. at 11.
. . .

- 7 -

> When given the opportunity to address the [trial] court [at the guilty plea hearing], trial counsel stated, "He is here. He has admitted that he did it. He's told us, he has told other people since his arrest that he, in fact, is guilty of this charge." N.T. at 18. Counsel further commented, "he is here today saying, I am the one who did this. Back then I was not the same person that I am now." *Id*. Following statements made by counsel, [Appellant] voluntarily addressed the court and stated, "I'd like to apologize to the Mirack family. . . . And to the family, I can't imagine what you're going through. I apologize." N.T. at 22.
>
> . . .
>
> At the conclusion of the hearing [on Appellant's motion for post-conviction DNA testing], the PCRA Court ordered both parties to file briefs[, and both parties complied].

[Trial] Court Opinion, 4/21/22, at 1-2, 10-11, 12, 13.

***Commonwealth v. Rowe***, 293 A.3d 733 (Pa. Super. 2023) (brackets in original), ***vacated and remanded by Commonwealth v. Rowe***, 344 A.3d 359 (Pa. 2025).

As noted at the outset of this memorandum decision, Appellant, hereinafter Rowe or Applicant Rowe, seeks post-conviction DNA testing pursuant to Section 9543.1. The statute provides in relevant part:

(a) Motion.--

(1) An individual convicted of a criminal offense in a court of this Commonwealth may apply by making a written motion to the sentencing court at any time for the performance of forensic DNA testing on specific evidence that is related to the investigation or prosecution that resulted in the judgment of conviction.

(2) The evidence may have been discovered either prior to or after the applicant's conviction. The evidence shall be available for testing as of the date of the motion. If the evidence was discovered prior to the applicant's conviction, the evidence shall not have been subject to the DNA testing requested because the technology for testing was not in existence at the time of the trial or the applicant's counsel did not seek testing at the time of the trial in a case where a verdict was rendered on or before January 1, 1995, or the evidence was subject to the testing, but newer technology could provide substantially more accurate and substantially probative results, or the applicant's counsel sought funds from the court to pay for the testing because his client was indigent and the court refused the request despite the client's indigency.

. . .

(4) DNA testing may be sought at any time if the motion is made in a timely manner and for the purpose of demonstrating the applicant's actual innocence and not to delay the execution of sentence or administration of justice.

(5) **Notwithstanding any other provision of law, a plea of guilty to a crime of violence**, as defined in section 9714(g) (relating to sentences for second and subsequent offenses), **or a confession given by an applicant concerning the offense for which the applicant was convicted, shall not prohibit the applicant from asserting actual innocence under subsection (c)(2) or the court from making a determination and ordering DNA testing under subsection (d)(2).**

(6) **The motion shall explain how,** after review of the record of the applicant's trial, there is a reasonable possibility if the applicant is under State supervision, or there is a reasonable probability if the applicant is not under State supervision, or **after review of the record of the applicant's guilty plea there is a reasonable probability, that the testing would produce exculpatory evidence that would establish:**

> **(i) the applicant's actual innocence of the offense for which the applicant was convicted;**
>
> . . .
>
> (c) Requirements.--In any motion under subsection (a), under penalty of perjury, the applicant shall:
>
> . . .
>
>> (3) present a *prima facie* case demonstrating that the:
>>
>>> (i) identity of or the participation in the crime by the perpetrator was at issue in the proceedings that resulted in the applicant's conviction and sentencing; and
>>>
>>> (ii) DNA testing of the specific evidence, assuming exculpatory results, would establish:
>>>
>>>> (A) the applicant's actual innocence of the offense for which the applicant was convicted;

42 Pa.C.S.A. § 9543.1(a)(1), (2), (4), (5), (6), and (c)(3)(i) and (ii)(A)

(emphasis added).

Furthermore, under Act 147, Section 9543.1(d)(2) provides:

> **(2) The court shall not order the testing requested in a motion under subsection (a) if**, after review of the record of the applicant's trial, the court determines that there is no reasonable possibility for an applicant under State supervision, or there is no reasonable probability for an applicant not under State supervision, or **after review of the record of the applicant's guilty plea**, **the court determines that there is no reasonable probability, that the testing would produce exculpatory evidence that:**

> **(i)** would establish the applicant's actual innocence of the offense for which the applicant was convicted[.]

42 Pa.C.S.A. § 9543.1(d)(2)(i) (emphasis added).

*Hardy* expounds on Section 9543.1(d)(2)(i), in pertinent part:

> **For an applicant** not under state supervision or **who entered a guilty plea, the statute elevates the applicant's burden to a "reasonable probability."** If the applicant fails to meet his burden, and if the court finds that there is "no reasonable possibility" (or "probability," as the case may be) that the requested DNA testing would produce results meeting the actual innocence standard, then the court is directed to deny the request under subsection(d)(2)(i).

*Hardy* at 424-25 (emphasis added).

Our Supreme Court has explained the above statutory requirements to post-conviction DNA testing, as follows:

> The applicant is required to take certain threshold steps, such as identifying the specific evidence at issue, consenting to provide samples of bodily fluids to be used in the DNA testing, and acknowledging that his own DNA will be uploaded to law enforcement databases and could be used as evidence in other prosecutions. The applicant further must provide a sworn statement asserting his actual innocence of the crime in question and swearing that the DNA testing is sought for the purpose of demonstrating the applicant's actual innocence.
>
> **Actual innocence of the crime is what the statute primarily aims to uncover. To that end, ... the applicant is required to present a *prima facie* case demonstrating that the identity of or the participation in the crime by the perpetrator was at issue in the proceedings that resulted in the conviction, and that DNA testing of the specific evidence, assuming exculpatory results, would establish the applicant's actual innocence of the offense for which the applicant was convicted**. If the applicant fails to make that showing, another provision of Section 9543.1 directs the court to deny the request: The court shall not order the testing if it

determines that there is no reasonable possibility that the testing would produce exculpatory evidence that ... would establish the applicant's actual innocence of the offense for which the applicant was convicted.

**Hardy**, 337 A.3d at 390 (emphasis added; quotation marks and footnotes omitted). **See also Commonwealth v. Carter**, (unpublished memorandum) 2025 WL 3215365 at *4 (Pa. Super. filed 11/18/2025) (quoting **Hardy**).

As this Court has observed,

> the quantum of evidence necessary to satisfy Section 9543.1(d)(2)(i) above and beyond the absence of the petitioner's DNA has never been explicitly defined. In this regard, [the Court is] not aware of any authority that holds or suggests that demonstration of "actual innocence" under Section 9543.1(d)(2)(i) requires a discovery of DNA from someone other than the petitioner. **Instead, the quantum of evidence necessary to satisfy Section 9543.1(d)(2)(i) above and beyond the absence of the petitioner's DNA has been, and should continue to be, determined on a case-by-case basis, as circumstances dictate.** Such circumstances might include the presence of another person's DNA, but not necessarily so. It is at least conceivable that certain circumstances or facts, in addition to or in conjunction with the absence of the petitioner's DNA in a particular location, may satisfy Section 9543.1(d)(2)(i) ...

**In re Payne**, 129 A.3d 546, 559-60 (Pa. Super. 2015) (*en banc*) (emphasis added; footnotes omitted); **accord Hardy**, 337 A.3d at 421-22.

The discrete issue before us is whether Applicant Rowe presented a "*prima facie* case" demonstrating that the identity of Ms. Mirack's rapist and murderer was at issue at the time of his guilty plea and that "DNA testing of the specific evidence, assuming exculpatory results, would establish" his "actual innocence." **See Hardy**, 337 A.3d. at 390. Under the current iteration of Section 9543.1, reproduced *supra*, a DNA applicant who has pleaded guilty

to the crime at issue makes a *prima facie* case of their "actual innocence" by presenting to the DNA court a petition making a case-specific and fact-specific showing that produces a reasonable probability that testing, assuming exculpatory results, would make it more likely than not that a reasonable juror would not find the applicant/defendant guilty. **Id**. Therefore, it was the DNA court's task below to apply this rubric to determine whether Applicant Rowe presented a theory of actual innocence that "might, in fact, be correct." **See Hardy**, 337 A.3d at 425.

In **Hardy**, the prosecution had relied solely on circumstantial evidence, including the defendant Hardy's incontrovertible motive, to convict Hardy for the worksite homicide of a co-worker committed in a multi-level warehouse during the night shift. Previous DNA tests failed to implicate Hardy or anyone else among those considered suspects, but Hardy petitioned for post-conviction retesting and new testing with next generation DNA testing. The lower courts denied his request, but the Supreme Court reversed.

The **Hardy** majority determined that under the language and purpose of the DNA statute, the facts of applicant Hardy's case compelled reversal and remand. Specifically, Hardy persistently had asserted his innocence,[2] the case against him was purely circumstantial, previous DNA testing had not implicated him or any other known suspect, and the presence of other people

---

[2] In **Hardy**, there was no question that identity was a disputed issue at trial, for he asserted his innocence and contended that the victim was murdered by another.

in the warehouse at the time made his case for additional, potentially more effective testing persuasive. *Id*. at 426.

Here, in contrast, direct evidence in the form of irrefutable DNA test results of semen found inside, on, and under Ms. Mirack's body unequivocally implicated Rowe as the source and thus placed him in Ms. Mirack's residence within the narrow timeframe[3] in which her rape and murder occurred. Furthermore, although Applicant Rowe momentarily denied responsibility for Christy Mirack's rape and homicide when confronted by investigators, he wavered from this position the following day and confessed to his defense team investigator that he "just snapped" once inside Ms. Mirack's residence and murdered her. At his guilty plea hearing, with his defense team present, he pleaded guilty and, at the conclusion of the guilty plea colloquy, turned to address Ms. Mirack's family and issued a specific apology to them, as reproduced *supra*.

**Hardy** also admonishes against reflexive reliance on the maxim that "absence of evidence is not evidence of absence," which the lower court in that case had incorporated in its decision denying post-conviction DNA applications as a response to prior DNA testing having excluded applicant

_____

[3] Ms. Mirack's roommate and fellow schoolteacher reported that she left their residence for work at 7:00 a.m. while Ms. Mirack was just finishing her wrapping of Christmas gifts that she was bringing to school. When Ms. Mirack did not report to school or answer phone calls, the school's principal checked Ms. Mirack's residence at 9:30 a.m. and found her deceased.

Hardy.[4]  **Hardy** cautions against both discounting the potential importance of more specific DNA testing that reinforces such prior results and dismissing preemptively the possibility that more sensitive testing will detect third-party DNA previously missed.

In this vein, the majority decision in **Hardy** reminds DNA trial courts making the "actual innocence" inquiry that they must undertake a speculative endeavor[5] that requires, first, the court's acknowledgement that absence of evidence where evidence would be expected is often probative and, second, acceptance of the possibility that new techniques will produce results that not only reinforce prior test results but also reveal a new DNA source that may call into question the applicant's conviction.  **Hardy**, 337 at 426.

Nevertheless, the speculative endeavor directive issued to DNA courts does not relieve a post-conviction DNA test applicant of their burden to make

_____

[4] Notably, the trial court in the present matter also invoked this maxim to support the proposition that "a test that is favorable to the petitioner does not guarantee an acquittal," TCO at 15.  Of course, a petitioner does not carry the burden to demonstrate that the requested DNA testing would guarantee their acquittal.  Although both concerning and illustrative of the potential pitfalls attendant to the actual innocence inquiry that **Hardy** discusses, this passage within the trial court's opinion is not reflective of an otherwise fair, fact-specific assessment of the petition made in accordance with the statutory mandate.

[5] A trial court's speculative endeavor arises from the recognition that the DNA test results that might establish the applicant's "actual innocence" under the above-discussed standard do not actually exist yet, because the testing has not yet been performed. The applicant necessarily must offer some "speculation and conjecture" as to what the requested DNA testing might reveal.  **Hardy**, 337 A.3d at 426.

a case-specific and fact-specific showing that, *inter alia*, they present a *prima facie* case of their actual innocence.

As outlined *supra*, where an applicant, as here, pleaded guilty to the charges in question, the applicant's actual innocence is judged by asking whether after a review of the entire record, including the guilty plea hearing, there is a reasonable probability[6] that the requested testing, assuming exculpatory evidence, would establish the applicant's actual innocence of the offense for which he was convicted. Put another way, we ask if it is reasonably probable that exculpatory DNA results would make it more likely than not that no reasonable juror would find him guilty beyond a reasonable doubt of the crimes charged. Section 9543.1(a).

This standard required the DNA court to make "a probabilistic determination about what reasonable, properly instructed jurors would do"[7] if, in the present case, they received evidence of exculpatory results of Touch

---

[6] The "reasonable probability" standard derives from Act 147 language imposing a more stringent standard upon applicants who pleaded guilty. As such, this standard must be construed as a heightened standard, more exacting than its counterpart, the "reasonable possibility" standard, which applies to the applicant who asserted their innocence throughout the proceeding in which they were convicted. Thus, we understand the "reasonable probability" standard as requiring the applicant to show that exculpatory DNA test results would produce at least a 50% likelihood of their actual innocence.

[7] **Hardy**, 337 A.3d at 423 (citing **Commonwealth v. Conway**, 14 A.3d 101, 109 (Pa. Super. 2011) (quoting **Schlup v. Delo,** 513 U.S. 298, 329, 115 S.Ct. 851, 867 (1995)).

DNA testing of the cutting board, teapot, and Ms. Mirack's sweater. Concurrently, a DNA court considers Section 9543.1(d) and shall deny a request for DNA testing if the applicant cannot carry their burden to show a reasonable probability that the testing would produce exculpatory evidence demonstrating their actual innocence. *Hardy*, 337 A.3d at 423.

At the outset of addressing this issue, the trial court proclaims that Rowe "cannot present a *prima facie* claim of actual innocence[,]" because his claim is founded upon "baseless excuses and denials that have been conjured up, years later, for his benefit" and "offers the incredulous explanation that another person must have entered the home and committed the crime shortly after he left." TCO at 8, 9-10. "At least five (5) other suspects, however, were investigated and all were cleared via DNA through testing of the blood and semen in the living room area[,]" the trial court observes. *Id.* at 9.

Rowe's theory admits that he had sex with Ms. Mirack in her residence that morning and does not depend on another source of the blood and semen collected on and underneath her body. His theory focuses, instead, on the acts of deadly violence inflicted on Ms. Mirack and on the absence of DNA testing of the cutting board and Ms. Mirack's sweater believed to have been used as weapons against her.

The trial court submits that it considered Rowe's theory of actual innocence—*i.e.*, that the party responsible for Ms. Mirack's death must have entered her residence only minutes after Rowe left following his consensual encounter with her—and deemed the theory wholly unsupportable after review

of the entire record. While the trial court's skepticism of Rowe's actual innocence theory may appear irreconcilable with the speculative endeavor that ***Hardy*** directs such courts to undertake when reviewing a DNA testing application, the trial court reaches such opinion only upon making a case-specific and fact-specific assessment of the record. This assessment led it to conclude that Rowe's theory of an intruder who appeared minutes after his departure, caused Ms. Mirack's rape-related injuries, and slayed her at the very spot on the living room floor where Rowe's semen deposits were located simply is incongruent not only with his confession and guilty plea and the totality of the evidence but also with the reasonable probability standard he was bound to meet.

Specifically, this evidence included crime scene investigators finding Ms. Mirack's pelvic area positioned directly over Rowe's semen on the rug, and forensic pathologists confirming both the presence of his semen on and inside her and the complete absence of a third party's DNA. Coupled with this direct evidence were vaginal, anal, and oral trauma, and bruising to her upper thighs, all of which was deemed consistent with sexual assault and, thus, inconsistent with Rowe's claim of consensual sex. Christmas packages strewn about the foyer, and Ms. Mirack's winter coat and gloves remaining on her body when she was found dead further suggested she was overtaken as she was leaving the residence prior to the sexual violence that occurred on or near the spot on the living room carpet where her body was found.

Therefore, in light of the totality of such evidence, we turn to the *prima facie* case language of Section 9543.1(c)(3) and ask whether applicant Rowe has shown there is a reasonable probability that DNA testing of the presumptive murder weapons—Ms. Mirack's sweater used in her strangulation and a wooden cutting board used to strike her head—and other items, namely, a toaster that was typically situated atop the cutting board, and articles of clothing worn by Ms. Mirack at the time of her death, assuming exculpatory DNA results, would establish his "actual innocence" of the rape and murder of Ms. Mirack. Stated differently, we ask whether exculpatory DNA results showing either the absence of Rowe's DNA or the presence of another's DNA, or showing both, would demonstrate that Rowe's theory of innocence—that the actual assailant entered Ms. Mirack's residence minutes after he left— might, in fact, be correct. **See Hardy** 337 A.3d at 426 (instructing that the court's fact-sensitive inquiry is to be made after reviewing the whole record,

including the record of a guilty plea hearing if the defendant pleaded guilty). [8, 9]

Here, the nature of the Commonwealth's evidence identifying Rowe as the perpetrator of the offense included physical evidence consisting of DNA test results extracted from semen collected from underneath, on, and inside Ms. Mirack's body at the crime scene, and direct evidence including Rowe's confession, made 26 years after the commission of the crime when police investigators confronted him with newly acquired evidence of a match between crime scene DNA evidence and his own DNA profile that he published

---

[8] In this context, "Actual innocence"

> refer[s] to the proposition that the anticipated, newly discovered DNA evidence would make it more likely than not that no reasonable juror would have found the applicant guilty beyond a reasonable doubt.[] This is a highly fact-sensitive inquiry that will depend upon the nature of the Commonwealth's evidence identifying the applicant as the perpetrator of the offense, as well as the possibility that the defense's theory of innocence could have been accepted as true by the fact-finder, if new and favorable DNA evidence were obtained.

***Hardy*** 337 A.3d at 426.

[9] Rowe's case challenging the identification evidence against him is comparatively weaker than was the case mounted by the applicant in ***Hardy***. The Supreme Court set forth the facts supporting why Hardy's identification case provided a solid foundation for the defense request for DNA testing. Rowe's case must be viewed as inferior given the presence of his semen at the scene, his confession to investigators and his defense team, and the highly coincidental theory of actual innocence he offers—the intervening sex offender appearing moments after he left following his alleged consensual sexual episode and just as Ms. Mirack was preparing to leave.

on the "23andMe" website. The defense disputed neither this forensic identification evidence nor Rowe's confession that he "just snapped" and committed the crimes with which he was charged.

Furthermore, at Rowe's guilty plea hearing, defense counsel reminded the plea court that Rowe confessed to investigators, confessed to his own defense team investigators, and continued to accept full responsibility leading up to the guilty plea hearing.

> **Defense Counsel**:     He is here.  He has admitted that he did it.  He's told us, he has told other people since his arrest that he, in fact, is guilty of this charge.
>
> [H]e is here today saying, ["]I am the one who did this.  Back then I was not the same person that I am now.["]
> . . .
>
> And I think that he has always, always, since the first day we met him, believed that the proper thing for him to do is to take this plea.  At that point we didn't even know if it would be offered by the Commonwealth, obviously, but he has always admitted this guilt and he has always recognized that there will be punishment. The only question was going to be what punishment.  So we're thankful that this is resulting in a life sentence.  We believe that's appropriate under the facts and circumstances . . . .
>
> As I indicated, there are a lot of people that have known him for a shorter period of time and have a great deal of difficulty believing that a person who's worked tirelessly for the community could have been a horrible person.
>
> I'm asking people to understand that he is admitting that he did this and he has always admitted to us that he did this.

N.T., 1/8/19, at 18-21.

Rowe personally admitted his guilt under the evidence recounted during the plea colloquy, which included a recitation of the specific criminal acts

alleged. Afterward, when the plea court gave him the opportunity to make a statement, he offered only an apology:

**The Court:** Mr. Rowe. Is there any comment you would like to make.

**Rowe:** Yes, Your Honor. I'd like to apologize to the Mirack family. I'm not sure where they are. . . . I'm sorry, sir. And to the family, I can't imagine what you're going through. I apologize.

N.T. at 22.

Therefore, the DNA court has not relied exclusively on the sufficiency of the Commonwealth's evidence to deny Rowe's application for DNA testing.[10] Rather, as may be gleaned from its opinion, it has complied with the statutory regime's directive to conduct a fact-specific review of all evidence in considering applicant Rowe's theory of actual innocence, which in this case may fairly be repeated as follows: the claimed third-party assailant forcibly entered Ms. Mirack's residence immediately after Rowe left and just as Ms. Mirack was leaving for school with holiday gifts in hand; the assailant drove her back into her residence and down onto the very location of the floor where, the presence of Rowe's semen would indicate, Rowe had consensual sex with her minutes earlier; and the assailant caused her vaginal and anal trauma and

_____

[10] The trial court expresses its opinion that the Commonwealth's evidence was sufficient to prove Rowe's guilt beyond a reasonable doubt. Nevertheless, it also addresses appropriately the discrete question of whether Rowe, as an applicant having pleaded guilty, met his burden of establishing by a reasonable probability that his theory of "actual innocence" might be correct.

bruising on her legs while raping her, strangled her with the sweater she was wearing, and struck her face with the cutting board.

The trial court further acknowledges the investigatory history of this matter in which police identified five other suspects, who were investigated and cleared by police after full investigations that included, *inter alia*, DNA testing to rule out each as the source of the semen samples collected in this case. Rowe contends the DNA tests of these individuals were irrelevant, as he admits he is the source of the semen, as he must, given the test results, but he fails to indicate specifically how the remainder of the investigations into each suspect left specific questions that could support his "actual innocence" position.

Furthermore, the trial court aptly notes that the post-mortem assessment of Ms. Mirack's vaginal, anal, and upper thigh bruising and abrasions were deemed inconsistent with consensual sex and consistent, instead, with sexual assault, an expert opinion with which Rowe's own defense team agreed. Yet, despite evidence of such forcible and injurious sexual contact between the assailant and victim, there was no recovery of physical evidence—semen, blood, hair, or otherwise—attributable to an unknown third person. Instead, the only physical evidence retrieved at the crime scene not belonging to Ms. Mirack belonged to Applicant Rowe.

We discern, therefore, that the trial court conducted the requisite "highly fact-specific" inquiry into all the evidence, as it considered the facts asserted in Rowe's theory of actual innocence, those asserted by the Commonwealth,

and those admitted to by Rowe and his defense team at his guilty plea. Assessing the totality of this evidence, the trial court concluded that Applicant Rowe had not carried his burden to present a fact-specific, *prima facie* case of his actual innocence, *i.e.*, the reasonable probability that exculpatory Touch DNA test results on the sweater and cutting board would make it more likely than not that no reasonable juror would find him guilty beyond a reasonable doubt.

The crux of the trial court's opinion in this regard is that if Rowe's "intervening assailant" theory of actual innocence is not altogether beyond belief, it is, at best, so highly improbable under a careful review of the facts as to fail under the reasonable probability test that the statutory rubric puts to all applicants who have pleaded guilty. Read fairly, the DNA court's opinion follows jurisprudence instructing that while the statute requires us to assume exculpatory DNA results and then engage in a speculative endeavor to consider the possibility of case-specific innocence stemming from such results, it does not direct DNA courts merely to accept the applicant's theory of actual innocence without reference to the specific facts of the case and the burdens of production placed on the applicant, mitigated as the latter is. Instead, in the case of an applicant who has pleaded guilty, DNA courts must require the applicant's fact-based theory of actual innocence to clear the "reasonable probability of actual innocence" bar described above.

In this case, the trial court evaluated Mr. Rowe's theory of actual innocence and concluded this theory of actual innocence was so utterly

improbable under the facts as to preclude Mr. Rowe from meeting his burden to show a reasonable probability that exculpatory touch DNA results on the cutting board, sweater, and toaster would more likely than not cause a reasonable juror to refuse to find him guilty. We agree with this assessment given the record before us.

The undisputed facts inform us of the approximate time that Ms. Mirack's roommate and fellow teacher left their residence for school as Ms. Mirack was putting a finishing touch on school Christmas gifts and saying she, too, would be leaving shortly to arrive at school on time. Very little time remained, therefore, to accommodate Rowe's now-alleged factual timeline, which he says consists of Mirack admitting him into her home, quickly joining him in consensual sex, seeing him out moments later, and then succumbing in a most coincidental, intervening moment of a second man who escaped Rowe's detection and forcibly entered her home just as she was leaving with gifts in hand. He dislodged the gifts, drove her backwards and down to the floor, and caused her injuries by brutally raping her and thereafter murdered her in the very spot where Rowe's semen lay from his sexual encounter with her just minutes earlier.[11]

*Hardy* calls upon courts to make a speculative endeavor to consider the possibility of actual innocence flowing from exculpatory DNA results, and it

---

[11] Ms. Mirack's roommate's statement to police and the presence of gifts strewn about the foyer supports the conclusion that Mirack was at her front door attempting to leave for work at her school that morning.

recognizes that the establishment of a *prima facie* case standard is a "low burden in the law." ***Id.*** at 425. Guided by this directive, we are nevertheless constrained to conclude Applicant Rowe's purported fact-based theory of actual innocence has not met his evidentiary burden. In this regard we find the operative facts are distinguishable from those in ***Hardy***.

In ***Hardy***, the applicant's persistent assertion of innocence and the purely circumstantial evidence against him coupled with other night-shift co-workers having opportunities to have committed the crime enabled the applicant Hardy to meet his burden of showing a reasonable possibility of his actual innocence. Here, in contrast, a heightened burden to demonstrate a reasonable probability of Rowe's actual innocence applies because of his confession of guilt and his subsequent guilty plea, and the presence of his semen inside, on, and under Ms. Mirack's body was direct evidence that he engaged in sexual activities in her living room around the time Ms. Mirack was raped and murdered.

Here, the lower court appropriately questioned whether Applicant Rowe, having pleaded guilty to charges that he murdered and raped Ms. Mirack, has demonstrated a reasonable probability that his requested DNA testing of the presumptive murder weapon and other items, assuming exculpatory results, would establish his actual innocence. ***See Hardy***, at 426. To this question, the trial court offered the following observations and conclusions:

> The cutting board is assumed to be the murder weapon and the other items are assumed to have been handled by the victim, assailant, or both during the last moments of Ms. Mirack's life. If

the items were to be DNA tested and did not result in finding the Petitioner's DNA on such items, this evidence would still not be sufficient to establish a *prima facie* case of actual innocence. . . . Given the circumstances of the case and the questionable version of events provided by the Petitioner, DNA testing would not establish his actual innocence, even if his DNA were completely absent from the requested items.

The Petitioner has failed to provide any evidentiary basis that would lead the court to believe an alternative suspect's DNA would be found at the crime scene. [The] Commonwealth presented evidence that during the investigation of this matter, the only DNA found on and under Ms. Mirack was the Petitioner's. [The] court is unable to fathom that someone else entered the home between the hours of 7:00 a.m. and between the time frame of 7:10 a.m. – 7:20 a.m., found the victim without her clothes on, covered in semen, and murdered her without leaving any additional DNA on her body.

In sum, the evidence presented by the Commonwealth, the Petitioner's own words of placing himself with Ms. Mirack the morning of the murder, and the DNA he left behind established that the Petitioner has not established a *prima facie* case of actual innocence and this failure would not be undermined by the potential that DNA could be found on the items surrounding Ms. Mirack at the murder scene.

Trial Court Opinion, 4/21/22, at 14-15.

The trial court determined that the totality of facts are such that exculpatory DNA results on the cutting board and sweater still would not make it more likely than not that no reasonable juror would find him guilty beyond a reasonable doubt. The record supports this conclusion.

Given the totality of this record, the lower court concluded that Rowe has not carried his burden of demonstrating a reasonable probability of his actual innocence even assuming exculpatory results from DNA testing of the presumptive murder weapons and the possible implications of such results.

Upon our review of the record, and for the reasons discussed, we agree with the trial court's assessment.  Consequently, we conclude that Applicant Rowe's claim that the trial court erred in denying his motion for DNA testing, pursuant to Section 9543.1(d)(2)(i) warrants no relief.

Order affirmed.


Judgment Entered.


Benjamin D. Kohler, Esq.
Prothonotary


Date: 01/22/2026